UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

BALL CORPORATION and BALL          )
CORPORATION CONSOLIDATED           )
HOURLY PENSION PLAN,               )
                                   )          No. 5:12-CV-201-REW
        Plaintiffs,                )
                                   )      MEMORANDUM OPINION AND
v.                                 )       ORDER (WITH REQUIRED
                                   )       FINDINGS OF FACT AND
SANDRA DURHAM and MARY             )       CONCLUSIONS OF LAW)
DURHAM,                            )
                                   )
        Defendants.

*** *** *** ***

The Court considers the pending Interpleader Complaint, which requests a

determination of which Claimant, Sandra Durham or Mary Durham, is entitled to

benefits, related to the deceased Curtis Durham, in a pension plan (Plan) established

under the Employee Retirement Income Security Act of 1974, as amended (ERISA), 29

U.S.C. § 1001, *et. seq.* DE #1 (Interpleader Complaint). The Court conducted a bench

trial on April 18, 2013. DE #32 (Minute Entry). The Interpleader Plaintiffs, Ball

Corporation and Ball Corporation Consolidated Hourly Pension Plan, attended by

counsel and observed but did not actively participate. Both Claimants testified and

actively cross-examined, and the Court heard both opening statements and closing

arguments.

Having considered the full record, the Court **FINDS** that Claimant Mary Durham

is the proper beneficiary and qualifies as the "Eligible Spouse" or "Surviving Spouse"

under the Plan.[1] Mary Durham, having entered into a valid common law marriage with Curtis Durham in Ohio that was not terminated by death, divorce, or dissolution, is the Claimant that was legally married under federal law to Curtis Durham, the Plan member, on the date of his death and throughout the year preceding his death. The Court enters a separate Judgment consistent with the reasoning and findings herein.

## I.  Introduction

### A.  *The Court has jurisdiction over the dispute and venue is proper in this federal District.*

The Court has jurisdiction over the instant dispute pursuant to 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331. Section 1331(a) generally establishes federal question jurisdiction. Further, ERISA itself specifically grants jurisdiction: "[Except for suits brought by individuals to recover, enforce, or determine rights], the district courts of the United States shall have exclusive jurisdiction of civil actions under this subchapter brought by . . . a fiduciary . . . ." 29 U.S.C. § 1132(e)(1); *see also IBEW Pacific Coast Pension Fund v. Lee*, 462 Fed. App'x 546, 548 (6th Cir. 2012) ("We have subject matter jurisdiction over an interpleader action initiated to determine the proper beneficiary of an employee pension benefit plan." (citing 29 U.S.C. § 1132(a)(3)(B)(ii)) and *Cent. States, Se. & Sw. Areas Pension Fund v. Howell*, 227 F.3d 672, 674 n.2 (6th 2000))); Fed. R. Civ. P. 22(a)(1); *Mattingly v. Hoge*, No. 3:05-CV-301, 2007 WL 204008, *2 n.4 (W.D. Ky. Jan. 23, 2007) ("Federal district court has exclusive jurisdiction over ERISA actions brought by fiduciaries. As the plan fiduciary, MetLife was permitted to bring an interpleader action in federal court." (citations omitted)). ERISA's jurisdictional grant is

_____

[1] *See* DE #1-2 (Pension Plan) § 1.20. The Court, like the Plan, uses these terms interchangeably.

without regard to the amount in controversy or the citizenship of the parties.  29 U.S.C. § 1132(f).

Here, Ball Corporation is the Plan Administrator.  Thus, pursuant to the statutory authority cited above, the Court has original jurisdiction over the matter.  Further, venue is proper in this District pursuant to 29 U.S.C. § 1132(e)(2), which provides that an action may be brought "where a defendant resides or may be found."  *Id.*  Both Defendants/Claimants live in the Eastern District of Kentucky.  DE #1 (Interpleader Complaint) at 2, ¶¶ 4,5 (identifying Sandra Durham as living in Orlando, Kentucky and Mary Durham as living in Stanford, Kentucky); *see also* 28 U.S.C. § 1391(b)(1).

### B.  The parties.

In this somewhat unusual but intriguing case, the parties' interests are distinct and well-defined.  First, the Interpleader Plaintiffs seek a determination of which of two competing Claimants is the proper beneficiary, as Surviving Spouse or Eligible Spouse under the Plan.

The competing Claimants, Mary Durham (Mary) and Sandra Durham (Sandra), both claim beneficiary status per the Plan, as Surviving Spouse of Plan participant, the late Curtis Durham (Curtis).[2]  Mary alleges a common law marriage to Curtis in Ohio from 1984, and Sandra alleges a ceremonial marriage in Kentucky from April 2002 to the date of Curtis's death, September 20, 2006.  On June 22, 2002, Mary married Robert Earl Northern in Kentucky.  The Court discusses the various details of these unions below.

---

[2] For ease during trial, the Court granted the parties' joint request to refer to the Claimants and the decedent by their first names.  Despite the informal nature, the Court continues that practice here for simplicity and ease of reference.

*C.  Question presented.*

The Interpleader Complaint presents one overriding question: Which Claimant is lawfully entitled to Plan benefits as Eligible Spouse?

The Court first addresses choice of law, next assessing the alleged common law marriage, whether that marriage remained intact, and whether subsequent events or developments, including the later solemnized Kentucky marriages, displace any rights dependent on the Ohio common law relationship between Curtis and Mary.  Ultimately, the Court finds that Mary and Curtis Durham had a valid common law marriage in Ohio that never legally ended.  As a consequence, Mary is the Surviving Spouse despite later events.  This result may seem somewhat unfair and unfortunate, given the parties' subsequent conduct, but the facts and law compel a result in Mary's favor.

**II.    Analysis**

By agreement of the parties, Mary presented her proof first at trial, although this did not affect any presumption or evidentiary burden.  Generally, the parties do not dispute the factual events, and the Court notes any discrepancy below.  Pursuant to Federal Rule of Civil Procedure 52(a)(1), the Court makes the following findings of fact and conclusions of law.

Mary met Curtis in April 1983, in Mt. Vernon, Kentucky while Mary was waiting tables.  DE #34 (Trial Tr.) at 15.  At that time, Curtis was laid off from his job with Heekin Can in Cincinnati, Ohio, and living with his mother in the Mt. Vernon area. *Id.* The two began a romantic relationship, although Curtis was called back to Heekin Can and relocated to Cincinnati in late 1983/early 1984.  *Id.*  at 16.  Curtis gave Mary a ring, and the couple got engaged in July 1983.  *Id.* at 47.  In October 1983, Mary entered into a

1-year lease on a restaurant in Mt. Vernon, and she did not move to Cincinnati until November 1, 1984.  *Id.* at 17.

Mary moved to Cincinnati to be married to Curtis, and the couple exchanged marriage vows, in the presence of his mother, on November 1, 1984, at Curtis's Cincinnati home.  *Id.* at 47.  Mary's was the only testimony on this point, but she backed up the timing with her October 1984 divorce papers (Mary's. Ex. 15), which freed her to marry Curtis.  The specific and particular testimony about the timing, the interplay with lease expiration, and the event details all combine to support the finding that the private and intimate ceremony, involving present intent to wed, did in fact occur.  The Court so finds.  The stated motivation for avoiding a formal ceremony—the couple's past negative experiences with formalized marriage—made sense in context.  Mary and Curtis held each other out as husband and wife from November 1, 1984 until they separated sometime around 2000.  *Id.*  During that full 16-year period, the couple purchased property together,[3] filed joint tax returns,[4] and considered themselves a married couple.  *Id.* at 18.  (Q: "Did you think that you were any more or less of a married couple because you didn't get a marriage certificate?  A: No. We were married.");  *id.* at 18-19 (Q: "Did you think you were anymore or any less of a married couple because you didn't have a

---

[3] At trial, Mary indicated that the couple purchased several pieces of property as husband and wife.  DE #34 (Trial Tr.) at 21-22, 48.  Mary's Ex. No. 3 is a deed for the purchase of property in Cincinnati, Ohio, by Mary and Curtis as husband and wife.  Mary's Ex. No. 1 is a deed for the purchase of property, again by Mary and Curtis as husband and wife, at 1067 Sutton Place.  Mary testified that the Sutton Place address was the couple's residence, and that, at some point, the couple also purchased the adjoining lot.  *Id.* at 48.
[4] Mary testified that the couple filed joint tax returns from 1985 to approximately 2000.  Mary's Ex. Nos. 4-8 are federal tax returns filed jointly as a married couple, encompassing the years 1988, 1989, 1990, 1991, and 1996, respectively.  Additionally, Mary's Ex. No. 9 is a statement of a loan account on the 1067 Sutton property, reflecting both Mary's and Curtis's names.

ceremony in a church? A: No.  Q: Or before a judge?  A: No.").  Mary obtained a social

security card in the name of Mary Durham, and Curtis's 1986 Last Will and Testament

leaves his entire estate to his "beloved wife, Mary Durham."[5]  *Id.* at 23-25; *see also*

Mary's Ex. No. 11.

At some point in 2000, Mary and Curtis separated, although the couple

experienced relationship difficulties as early as 1998.  DE #34 (Trial Tr.) at 18

(describing relationship as a "backwards and forth thing from '98 to 2000"); *id.* at 27

(noting final separation in 2000).  Mary and Curtis did seek advice of counsel, and the

couple understood that they would need to either obtain a divorce or formally dissolve

their common law marriage.  *Id.* at 27.  Their corporate attorney even drafted papers, but

Curtis and Mary did not sign the documents or otherwise seek further formal termination

of the marriage.  Per Mary: "[Curtis] wouldn't pay for the divorce.  I wouldn't pay for the

divorce.  So we didn't get no divorce."  *Id.* at 27-28; *see also* Mary's Ex. No. 14

(including correspondence from a Cincinnati lawyer concerning dissolution between

Mary and Curtis); *id.* (November 22, 2000 letter from the lawyer noting that no payment

had been received).  Mary confirmed at trial that she and Curtis never formally

terminated the marriage in any jurisdiction.

Mary does receive social security benefits as Curtis's widow.  The record reflects

a March 2009 letter indicating Mary's entitlement to monthly widow's benefits.  Mary's

Ex. No. 13.  At some point, Mary went to the social security office and learned, initially,

that she would be unable to collect benefits because of Curtis's marriage to Sandra.  Mary

---

[5] Curtis's 1986 will also names Mary's son from a prior marriage, Denvin Esley Miller, as his "step-son" and an alternate beneficiary.  Mary's Ex. No. 11; *see* also DE #34 (Trial Tr.) at 26.

informed the office that she had a prior common law marriage to Curtis in Ohio. After an independent investigation, which required Mary to submit final divorce paperwork from her earlier divorces and from Curtis's prior divorces and included interviews by the office with two of Curtis's sisters, the office awarded Mary widow's benefits. DE #34 (Trial Tr.) at 31-35; *see also* Mary's Ex. No. 13.

After Curtis and Mary separated, Curtis married Sandra (Bowles) Durham on April 10, 2002, in Orlando, Kentucky. On the marriage license, Curtis listed his marital status as divorced and cited just 2 prior marriages. *See* Sandra's Ex. No. 2. On June 22, 2002, Mary married Robert Earl Northern in Renfro Valley, Kentucky. On the marriage license, Mary listed her marital status as divorced and also cited 2 prior marriages. *See* Sandra's Ex. No. 3. At trial, Mary testified that, prior to entering into a common law marriage with Curtis, she was ceremonially married to and divorced from both Denvin Miller and Floyd Hayes. DE #34 (Trial Tr.) at 19, 33. She also testified that, prior to her common law marriage with Curtis, he was formally married to and divorced from Judy Durham and Wanda Hasty.

Unlike Sandra's marriage, which ended with the unfortunate passing of Curtis, a Rockcastle Circuit Court ultimately invalidated Mary's marriage to Northern. Mary's Ex. No. 12. Per the 2008 judgment, in the case Northern initiated, the court found that Mary was, at the time of her marriage to Northern, married to Curtis under a valid common law marriage from Ohio. *Id.* The court thus invalidated the marriage (on Northern's petition) and restored Mary's name to Mary Durham. At trial here, Mary explained that her marriage to Northern was not traditional. DE #34 (Trial Tr.) at 49 ("Actually, we were childhood sweethearts, and it was just a big deal. We never did

consummate our marriage. He – [Robert Northern] stayed in Mt. Vernon probably maybe two weeks, and then he went to work in Owensboro, Kentucky, and we just lived separate lives. We never did live together."). As to Northern's motive for filing the petition for a declaration of invalidity, Mary indicated that Northern possibly believed that Mary might have or receive wealth that he might someday inherit. *Id.* at 50. Mary, who did not have counsel per the document, did not actively participate in the invalidity proceedings, stating that she "didn't care" and "wasn't going to bother with it." *Id.*

Mary testified she always believed that her marriage to Curtis was valid, although she struggled with her marital status after she and Curtis remarried. Mary testified to a conversation that she had with Curtis and Sandra in which Curtis supposedly told Mary that he had spoken to William Gregory, a Kentucky lawyer,[6] who allegedly advised at an unknown point that Curtis and Mary did not have to get divorced because Kentucky did not honor common law marriages. *Id.* at 29. Based on Curtis's representations, and the fact that Curtis remarried first, Mary felt free to and ultimately did marry Robert Northern.

Sandra knew some about Curtis's history with Mary, although she did not know that the two potentially had entered into a common law marriage in Ohio prior to Sandra's marriage to Curtis. *Id.* at 63. Sandra met Curtis the day after her first husband died in 1999, when Curtis and his then-girlfriend Linda brought a bucket of chicken to visitation at her house. *Id.* at 59. Sandra first met Mary when Mary was selling property

---

[6] Undoubtedly, there is some awkwardness here, since Gregory is counsel of record for Sandra. No one raised any issue or complaint about this oddity in the trial, and Gregory did not propose to testify. The only proof was via the remarks Mary attributed to Curtis. There was no objection to consideration of the testimony.

that she and Curtis owned jointly and needed Curtis and Sandra to sign the deed as husband and wife. *Id.* The women had little contact after that, though Sandra testified to seeing Mary at bingo, and Mary attended Curtis's funeral (signing the guest book as Mary Northern). When Sandra probated Curtis's will and the court appointed her as Executrix, Mary did not protest or otherwise seek to contest the validity of the will. *Id.* at 64. Sandra alone paid for Curtis's funeral. *Id.*

Sandra did not know or evidently suspect that, at the time of her marriage to Curtis, he had earlier entered into a common law marriage with Mary that would need to be formally terminated under Ohio law. She understandably took at face value Curtis's statement that he was divorced. *Id.* at 65. She did testify that, had she known that Curtis was still legally married to Mary, she would have demanded that Curtis get a divorce prior to their own nuptials. *Id.* at 70. When Sandra saw Mary's name on the deed that she signed at the bank, it was the first time Sandra saw Mary referred to as "Mary Durham." *Id.* at 73. But, no one had ever disclosed the true extent of Curtis's relationship with Mary to Sandra. In fact, Curtis passed away nearly two years before the Rockcastle Circuit Court invalidated Mary's marriage to Northern based on her pre-dating marriage to Curtis.

### A. Choice of Law

The choice of law question here implicates a unique web of interrelated authorities. Mary generally argued for application of Ohio law to determine the validity of her common law marriage, DE #30 (Memorandum of Law) at 2, but did not argue a particular application for other issues in the case. In closing argument, however, Mary defended her position as Eligible Spouse under an application of either Kentucky or Ohio

law. DE #34 (Trial Tr.) at 86-81. Sandra generally argued for application of Kentucky law, noting "sufficient contacts in this action as required in Restatement (Second) § 283." DE #31 (Brief) at 3-4. The Court finds merit in both arguments but ultimately takes a more nuanced approach.

In disputes of this nature, ERISA itself "supplies the rule of law." *IBEW Pacific Coast*, 462 Fed. App'x at 548 (citing *Metro Life Ins. Co. v. Pressley*, 82 F.3d 126, 129-30 (6th Cir. 1996); 29 U.S.C. § 1001 *et. seq.*). Specifically, the rule of law requires a fiduciary to pay benefits "in accordance with the documents and instruments governing the plan." § 1104(a)(1)(D); *see also IBEW Pacific Coast*, 462 Fed. App'x at 548. ERISA's rule is a "clear mandate" that an administrator must follow to determine the appropriate beneficiary. *IBEW Pacific Coast*, 462 Fed. App'x at 548 (citation omitted); *see also Union Sec. Ins. Co. v. Blakely*, 636 F.3d 275, 276 (6th Cir. 2011) ("ERISA directs that the *plan documents* determine the beneficiaries . . . and repeatedly underscores the primacy of the written plan.").

The Plan at issue here directs payment, upon the death of a member, to that member's "Eligible Spouse," which the plan defines as "the surviving spouse to whom the Member had been legally married under federal law on the date of his or her death throughout the one (1)-year period preceding the date of death. " DE #1-2 (Pension Plan) at §§ 1.20, 4.1(e)(1). "Plan administrators and federal courts routinely rely on state law to identify a participant's spouse in determining the proper recipient of spousal benefits." *IBEW Pacific Coast*, 462 Fed. App'x at 549 (citations omitted). Further, when determining which state's law should apply, a court's "'analysis is governed by the choice of law principles derived from federal common law.'" *DaimlerChrysler Corp.*

*Healthcare Benefits Plan v. Durden*, 448 F.3d 918, 925 (6th Cir. 2006) (citation omitted).

Absent clearly established federal choice of law rules, a court looks to the *Restatement (Second) of Conflicts of Law*. *Id.* at 922 (citation omitted). Thus, "although the underlying legal issue [in] this case is a contractual issue about rights and duties under the Plan, [a court] must look to [*Restatement (Second) of Conflicts of Law*] section 283 to analyze which state's law governs the determination of which claimant was legally married to [the Member] at the time of his death." *Id.*

Section 283 states, in part: "The validity of a marriage will be determined by the local law of the state which, *with respect to the particular issue*, has the most significant relationship to the spouses and the marriage under the principles stated in § 6." *Restatement (Second) of Conflict of Laws* § 283(1) (1971) (emphasis added). Section 6 identifies the following principles:

> (a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied.

*Id.* § 6(2).

Here, analysis of those factors in the context of § 283 leads the Court to apply both Kentucky and Ohio law, segregated by issue. Specifically, and for the reasons below, the Court applies Ohio law to govern proof concerning Mary's common law marriage, Kentucky law to govern Sandra and Curtis's solemnized marriage and, though a tougher call, Kentucky law to the question of marriage priority.

Under the factors enumerated in Section 6, Ohio law properly governs Mary and Curtis's common law marriage. Specifically, factors (c)-(f) support application of Ohio law to this issue. Ohio, as the state recognizing the common law union, has a particular interest in the determination of the issue. Ohio has developed a body of law governing the formation and recognition of common law marriages and retains an unquestionable interest in the uniform recognition and application of those legal principles. Further, application of Ohio law promotes certainty, predictability, and uniformity of result in disputes of this nature, and additionally protects the justified interests of the parties. Here, Mary and Curtis formed their union and lived together for approximately 16 years in Ohio, and Curtis worked and developed the corpus at issue at an Ohio canning factory. Ohio law properly governs Mary's claim of a common law marriage to Curtis.

Further, for many of the same reasons, the Court applies Kentucky law with respect to the solemnized marriage between Sandra and Curtis. Curtis and Sandra met in Kentucky, entered into a ceremonial marriage in Kentucky, and resided together in Kentucky until Curtis died. Sandra submitted various official Kentucky documents in support of her claims of a ceremonial marriage, estate administration, and Curtis's death. Kentucky is the forum for the instant dispute. Sandra and Curtis reasonably would have expected Kentucky law to apply to govern the validity of their marriage transaction, and applying Kentucky law promotes certainty, predictability, and uniformity of result. Kentucky plainly has an interest in applying its own law to determine the validity of a marriage celebrated in the state. Ohio has no genuine interest in the transaction: the parties married and lived together as man and wife in Kentucky. Together, all of these

Kentucky-specific contacts, combined with the § 6 principles, result in the application of Kentucky law as to the solemnized marriage of Sandra and Curtis.

Finally, but most centrally to the dispute, the Court finds that Kentucky law is appropriate to resolve the question of marriage priority. Kentucky and Ohio law generally treat the effect of second marriages on a prior marriage quite differently, although, on this record, the Court believes that application of either law would produce the same result. As to factor (b), the relevant policies of the forum:

> Kentucky courts traditionally have been quite egocentric with regard to conflict of law questions. *Wallace Hardware Co. Inc. v. Abrams,* 223 F.3d 382, 391 (6th Cir. 2000). While reviewing Kentucky choice of law cases, the Sixth Circuit recently noted that "when a Kentucky court has jurisdiction over the parties, '[the court believes that its] primary responsibility is to follow its own substantive law. The basic law is the law of the forum, which should not be displaced without valid reasons.'" *Adam v. J.B. Hunt Transport, Inc.,* 130 F.3d 219, 230-31 (6th Cir. 1997) (quoting *Foster v. Leggett,* 484 S. W.2d 827, 829 (Ky. 1972)). "'If there are significant contacts-not necessarily the most significant contacts-with Kentucky, then Kentucky law should be applied.'" *Id.*

*Republic Servs., Inc. v. Liberty Mut. Ins. Co.*, No. 03-494-KSF, 2007 WL 152102 (E.D. Ky. Jan. 12, 2007). Clearly, Kentucky preferences would result in an application of Kentucky law. Further, given that one of the marriages at issue occurred in Kentucky and that Curtis died in Kentucky, factor (b) favors Kentucky law. All of the players have some history of significance in the Commonwealth.

As to factor (c), Ohio does not share Kentucky's dramatic preference for applying its own law, following more traditional choice of law principles. *See Preferred RX, Inc. v. Am. Prescription Plan, Inc.*, 46 F.3d 535 (6th Cir. 1995) (noting the application of Ohio law, "a decision supported by Ohio's choice of law rules, and the Restatement (Second) of Conflicts, on which they are based" (citations omitted)). Ohio does have

significant interests in the application of its law here, however, given that only Ohio law governs the formation of a common law marriage, Mary and Curtis lived in Ohio together for 16 years, and Curtis's employment in Ohio resulted in the funds at issue. The Court has not identified, and no party has suggested, that any other sovereign's law might apply. Factor (c) favors Ohio law.

Factors (d) and (e) are ultimately dispositive in the Court's decision to apply Kentucky law. Particularly (d), or the "protection of justified expectations." Each party had a long Kentucky history. Mary and Curtis met here, but cohabitated in Ohio; Curtis and Sandra married formally in Kentucky. After Curtis and Mary split up, both returned to Kentucky and both entered into later marriages in Kentucky. Further, Curtis and Mary ultimately did not divorce or formally dissolve their common law marriage because they supposedly perceived that Kentucky law did not recognize their Ohio union. Both appear to have entered later marriages in Kentucky under the good faith assumption that, while their marriage had been valid in Ohio, their relocation to Kentucky obviated any need for formal court resolution. As to factor (e), Kentucky has a strong present interest in regulating marriage. *Rose v. Rose*, 46 S.W. 524 (Ky. 1898) ("[A]s every well-organized society is essentially interested in the existence and harmony and decorum of all its social relations, marriage, the most elementary and useful of them all, is regulated and controlled by the sovereign power of the state[.]"); 15 *Ky. Prac. Domestic Relations L.* § 3:1 (2012) ("The notion that states may regulate marriage is axiomatic."). Parties marrying in Kentucky submit themselves to Kentucky's laws and regulations, rationally expecting Kentucky law to govern any resultant dispute. Further, although the Court has already found that Ohio law governs the initial validity of the common law union

between Mary and Curtis, application of Kentucky law to marriage priority is not inconsistent with this distinct issue-based analysis.

Finally, as to factor (f), or the "certainty, predictability, and uniformity of result," the Court notes that, on this record, and as discussed more fully below, application of either Kentucky or Ohio law would result in Mary's favor. Thus, the factor is neutral.

The record presents both Kentucky and Ohio contacts but, on balance, and in light of Kentucky's forum-centric attitude toward application of its own law, the Court finds Kentucky law the most appropriate to govern the question of marriage primacy.

> **B. Mary and Curtis did enter into a valid common law marriage in Ohio in 1984, which they did not dissolve or end formally via divorce.**

Mary proved, by clear and convincing evidence, that she and Curtis entered into a common law marriage in Ohio on November 1, 1984.[7] DE #37 (Trial Tr.) at 17. A party claiming a common law marriage must establish the following elements by clear and convincing evidence: "(1) an agreement to marry in praesenti[8] by parties competent to contract; (2) cohabitation as husband and wife; (3) the parties must hold themselves out as husband and wife; and, (4) the parties are treated and reputed as husband and wife by the community." *Drummer v. Drummer*, No. 12-11-10, 2012 WL 2559461, *9 (Ohio Ct. App. July 2, 2012) (citing *Nestor v. Nestor*, 472 N.E.2d 1091 (1984)). A party may prove the first prong, a present agreement to marry, by "direct evidence which establishes agreement, or by proof of cohabitation, acts, declarations, and conduct of the parties and their recognized status in the community in which they reside." *Id.* If a party cannot present direct proof, "testimony regarding cohabitation and community reputation tends

---

[7] Ohio does not recognize common law marriages entered into on and after October 10, 1991. Ohio Rev. Code Ann. § 3105.12(B)(1).
[8] Defined as "at present" or "right now." *Blacks Law Dictionary* (9th ed. 2009).

to raise an inference of the marriage." *Id.* The unique circumstances of the case dictate the weight of the inference, although a longer period of living together and cohabitating as man and wife generally strengthens the inference. *Id.* Mary presented both direct proof and testimony about her relationship with Curtis, which, taken together, establish proof of a common law marriage to Curtis Durham by clear and convincing evidence.

Mary testified sincerely and credibly that Curtis gave her an engagement ring in July 1983, and the couple intended to marry as soon as her divorce was final. DE #34 (Trial Tr.) at 47. Within days of her divorce being final and the restaurant lease expiring, Mary moved to Cincinnati to be with Curtis. *Id.* at 17. On November 1, 1984, the couple exchanged marriage vows in the presence of his mother, and Curtis gave Mary a wedding band. The couple held each other out as husband and wife, and began to live as husband and wife from that day forward. *Id.* Sandra offered nothing to discredit Mary's testimony about the couple's intentions, beliefs, or actions.

In addition to testimony about the unconventional wedding ceremony, Mary presented evidence indicating that the couple clearly held themselves out as husband and wife over an extended period. First, the couple, on at least two occasions, purchased property as "husband and wife." *See* Mary's Ex. Nos. 1, 3. Second, Mary testified that the couple filed joint (married couple) federal tax returns from 1985 to approximately 2000. The record reflects joint federal tax returns from 1988, 1989, 1990, 1991, and 1996. Mary's Ex. Nos. 4, 5, 6, 7, 8.[9] Additionally, a 1991 loan account statement from the 1067 Sutton Avenue address reflects both Curtis and Mary Durham. Further, Curtis executed a Last Will and Testament in 1986 referencing Mary Durham as his "beloved

_____

[9] The record also reflects that Mary filed individually in Ohio in 2001. Mary's Ex. No. 10

wife" and Denvin Esley Miler, Jr., Mary's son from a prior marriage, as an alternate beneficiary and "my step-son." Mary's Ex. No. 11. This is plain evidence of the relationship as it existed in Ohio over a course of many years.

Additionally, the Court recognizes that two neutral bodies have found the existence of a valid common law marriage between Mary and Curtis. First, in 2008, a Rockcastle Circuit Court invalidated Mary's marriage to Robert Northern because she was, at the time she putatively married Northern, still legally married to Curtis under an Ohio common law marriage. Although Mary's testimony about her lack of participation in the proceedings may undercut those findings, *see* DE #34 (Trial Tr.) at 50 ("I didn't care, so I didn't bother with it"), the Court does note the non-binding decision of an independent judicial body, under Kentucky law, in this regard. Similarly, the Social Security Administration determined (after its own investigation) to award Mary widow's benefits. Mary's Ex. No. 13; *see also* DE #34 (Trial Tr.) at 32-35. Sandra was perhaps not privy to those proceedings, but the record includes the results and Sandra did not object to Mary's use of the other assessments.

Mary presented specific testimony about the engagement and marriage ceremony. She assumed Curtis's last name, even obtaining a social security in the name of Mary Durham. The couple lived together at 1067 Sutton Avenue for almost the entirety of their common law marriage. Taken together, this evidence establishes that Mary and Curtis had an agreement to marry in praesenti, as of November 1984.

Further, based on the deeds, will, and joint tax returns, the couple did cohabitate and did hold themselves out to the community as man and wife. Ohio does not require that everyone in the community regard the couple as man and wife: "the 'reputation' of

being married need only exist in a couple's circle of acquaintances." *Bevan v. Bevan*, No. 2005-L-018, 2006 WL 1519654 (Ohio Ct. App. 2006) (citing *Nestor*, 472 N.E.2d at 146). Mary did not present testimony or offer specific documentation about community reputation, but the Court draws fair inference from the fact that the Social Security Administration, before awarding Mary widow's benefits, conducted an independent investigation into the couple's marriage. Per Mary, the agency contacted two of Curtis's three sisters prior to awarding widow's benefits. Additionally, the Court notes that in both of the deeds presented, *see* Mary's Ex. Nos. 1, 3, the couple received deeds to property as husband and wife. Each deed is signed by the grantors, as well as two witnesses. *Id.* Curtis's will, identifying Mary as his wife, is also signed by two witnesses. Mary's Ex. No. 11. A third-party preparer handled the tax returns, and the bank records show that the bank corresponded and communicated with the Durhams as a couple. Public documentation qualifies as reputational proof. *Smith v. Smith*, No.77 CA 13, 1978 WL 216324, *3 (Ohio Ct. App.) (recognizing as valid proof "the spreading upon the public records of the county in which they live of the fact of joint ownership of real estate and of being joint debtors . . . [such] being signed as husband and wife"). Mary properly established reputation. On the whole, the Court finds each element satisfied by clear and convincing evidence.

Additionally, the Court finds that Mary and Curtis did not dissolve or otherwise obtain a divorce from their common law marriage. Ohio common law marriages entered into prior to October 10, 1991, remain valid after that date unless terminated by death, divorce, dissolution of marriage, or annulment. Ohio Rev. Code Ann. § 3105.12(B)(2). Here, Mary testified that she and Curtis sought legal advice in anticipation of formally

ending their common law marriage but ultimately did not participate in any kind of

formal divorce or dissolution[10] proceeding:

Q: Did you talk with any attorneys about what you may need to do to legally terminate your relationship?

A: Yes.

Q: Okay.  What was your understanding of what was required for you and Curtis to separate at that time?

A: We had to get a common law marriage divorce, dissolution.

Q: Okay.  And did you or Curtis seek out an attorney to help you with that?

A: Curtis had an attorney – well, he was our corporate attorney, and he drawed up some papers, but we never did go on with it.  We never did – he wouldn't pay for the divorce.  I wouldn't pay for the divorce.  So we didn't get no divorce.

Q: Okay.

A: But he said we – let me think of the attorney.  I can't remember.  But, anyway, the attorney said that we would have to get a common law marriage divorce, and he sent papers for us to sign, but I never did sign any.

Q: And to the best of your knowledge did Curtis sign those papers?

A: No.

Q: Was – to the best of your knowledge did – was Curtis aware of the fact that you needed to terminate your marriage?

A: Yes.

Q: Okay. Have you ever been formally divorced from Curtis Durham?

A: No.

Q: Not in Ohio, not in Kentucky, not in Tennessee, not in Florida, not anywhere?

---

[10] Dissolution, premised largely on a court-approved agreement, is a statutory proceeding. *See* Ohio Rev. Code Ann. § 3105.61, *et. seq.*  Divorce is also statutory. *See id.* § 3105.01, *et. seq.*

A: No.

Q: You've never appeared at a courthouse, you've never signed any documents, you've never been put on notice that your marriage from Curtis Durham was terminated?

A: No.

Q: And you never initiated proceedings to terminate the marriage . . . ?

A: No.

DE #34 (Trial Tr.) at 27-29.

Documentary evidence submitted at trial supports Mary's testimony. Specifically, Mary's Ex. No. 14, collectively, a series of letters from the law firm Rendings, Fry, Kiely, & Dennis, LLP, indicates that the couple sought legal advice about formally terminating their marriage as early as 1998. The last-dated letter, written on November 22, 2000, confirms Mary's testimony that, at least as of that date, neither party had paid the legal fees and the case was stalled pending payment. *Id.* (November 22, 2000 letter) ("Please recall that on September 8, 2000, we forwarded to you our invoice in this matter, and advised you that we would move forward with the dissolution once payment was received. To date, we have not received payment."). This is direct proof that the status quo remained unchanged.

Mary did not submit a certification of the absence of a dissolution or divorce record under Federal Rule of Evidence (FRE) 902, which is a legitimate form of proof and procedurally proper under FRE 803 to prove the absence of a public record. DE #34 (Trial Tr.) at 84; *see also* Fed. R. Civ. P. 44. Counsel admitted that such proof would be possible, *id.* at 84 ("Your Honor, they would be – I guess that is theoretically possible."), but argued that the potential scope of such a certification would be extremely burdensome. *Id.* at 84 ("[W]ere that the burden to satisfy that, would literally require us

to bring in some sort of copy from the clerk of very jurisdiction in the United States.").[11] Mary focused on the lack of contradictory evidence, noting the outcome of the Social Security Administration's independent investigation. *Id.* at 85.[12]

The Court credits Mary's testimony and the documentary evidence and finds that Mary and Curtis did not formally divorce or otherwise dissolve their common law marriage. When the parties separated, they were still legally married pursuant to a valid Ohio common law marriage. Thus, the Court must consider the effect, if any, of each participant moving to and ultimately remarrying in Kentucky.

Kentucky does not itself recognize common law marriage, but the Commonwealth does recognize marriages if valid in the state where solemnized. K.R.S. § 402.040. Although the statute requires a solemnized marriage, Kentucky also recognizes a common law marriage if valid in the state in which the parties entered into the common law marriage. *Rader v. Celebrezze*, 253 F. Supp. 325 (D.C. Ky. 1966) (quoting *Brown's Admr. v. Brown*, 215 S.W.2d 971, 975 (Ky. 1948)): "'Common law marriage is not recognized in this State, . . . . But if a common law marriage is entered upon in a State where it is valid, then if the marriage is valid there, it will be treated as valid here.'"). Thus, when Mary and Curtis separated and each moved to Kentucky, they in Kentucky's eyes were still legally married under their Ohio common law marriage. *See also* Graham & Keller, *Ky. Practice Domestic Relations Law*, § 3:24 ("Kentucky does not recognize common-law marriages contracted within this state. However, a common-law marriage valid in the state in which it was contracted will be recognized in Kentucky.").

---

[11] The Court disagrees that this would be as burdensome as described, given venue rules, but each party is in charge of its own proof.

[12] Of course, Sandra had the same exploratory, proof, and discovery options.

Kentucky and Ohio follow different presumptions about the effect of second marriages in analyzing marital priority. The majority rule, which Kentucky follows, states that "a [later] marriage is presumed to be legal until proven otherwise." *Domany v. Otis Elevator, Co.,* 369 F.2d 604, 611-12 (6th Cir. 1996); *see also Scott's Adm'r et al. v. Scott*, 77 S.W. 1122, 1124 (Ky. 1904) ("It is the law in this state that, when a marriage is shown in fact, the law raises a strong presumption, especially after the lapse of many years, in favor of its legality, and the burden is with the party objecting to its validity to prove that it is not valid."). The presumption is not, of course, conclusive but does shift the burden of proof. *Scott's Adm'r et al.*, 77 S.W. at 1124 (citing *Howton v. Gilpin*, 69 S.W. 767 (Ky. 1902)). Under this approach, "'[i]t will be presumed that the disability of a prior marriage has been removed by a divorce before one of the parties had contracted a second marriage.'" *Id.* (citing 19 *Enc. Law* 1208 (2d Ed.)). The evidentiary burden is a preponderance. *Gardner v. Oldham*, 381 F.2d 804, 807 (5th Cir. 1967).

Ohio follows the minority rule, which presumes that a first marriage continues until proof of its termination. *Domany*, 369 F.2d 611. Under this approach, the party claiming validity of the second marriage bears the burden of overcoming the presumption. *Id.* "[I]t is further presumed that there was no valid divorce in the first marriage in the absence of positive proof." *Id.* (citations omitted).

Applying Kentucky law, the Court finds that Mary proved by a preponderance that she and Curtis were still married when he married Sandra, thus creating a disability to the second marriage. The Court has already found (1) a valid common marriage between Mary and Curtis that was (2) not terminated by divorce or dissolution. As

Kentucky recognizes a valid common law marriage entered into in another state, the couple's separation in Ohio and subsequent return to Kentucky do not lawfully terminate or otherwise affect the status of the marriage. Mary thus overcame the presumption.

Mary's testimony that the couple (1) married on November 1, 1984, via an exchange of rings and vows, (2) held themselves out as husband and wife for nearly sixteen years, and (3) did not engage in formal divorce or dissolution proceedings, as buttressed by the supporting documentary evidence submitted, compels a finding that the couple was still married under an Ohio common law marriage on June 22, 2002, the date Sandra and Curtis entered into their ceremonial marriage. Sandra's testimony that Curtis never referred to Mary as a previous wife and did not discuss their common law marriage creates a counter-inference[13] but cannot compete with the strength and force of Mary's competent proof.[14]

The Court thus finds that Mary and Curtis were validly married until his death. Therefore, Mary is entitled to judgment and ensuing benefit distributions from and in accordance with the Plan.

---

[13] Likewise, the Court has taken account of the fact that Mary did not question Curtis's later will (which named Sandra as wife) and that Mary identified only two prior marriages on the Northern marriage certificate. She certainly explained the animus behind her change of heart, by referencing Sandra's derogatory public remarks. She also explained her perception of the Curtis-Mary marriage and the view that moving to Kentucky may have affected the legal validity of that marriage. This tempers the inferences positive to Sandra.

[14] To the extent Sandra argues that Mary did not prove that she was unmarried and eligible to enter into a common law marriage with Curtis, DE #31 (Sandra Durham Brief), the Court rejects that argument. During trial, Mary tendered a Final Decree of Divorce from Campbell County, Tennessee, awarding her a divorce from Denvin Esley Miller on October 19, 1984. *See* Mary's Ex. No. 15. No party alleges, and the Court does not find, that Mary had any intervening relationships between October 19, 1984, and November 1, 1984. The record plainly reflects that Mary was divorced at the time she married Curtis.

Alternatively, the Court would reach the same conclusion under Ohio law. Under an application of Ohio law, Sandra would bear the burden of showing that Curtis and Mary formally divorced or dissolved their common law marriage. Sandra presents no proof of a divorce or dissolution. Instead, she here argues that Northern did not timely file an action to have the marriage invalidated, and thus Sandra should be estopped from referencing the invalidity of her marriage to Northern in support of her claims. DE #31 (Sandra Brief) at 4-7.

Sandra asserts that Kentucky law should have barred Northern from seeking to invalidate his marriage to Mary because the action was beyond the statute of limitations. DE #31 (Sandra Brief) at 5. Thus, per Sandra, Curtis's death removed any prior impediment to Mary's solemnized marriage to Northern. Under this theory, Mary was legally married to Robert Northern, which would make Sandra the legal widow of Curtis. *Id.* Sandra misunderstands the mechanics of K.R.S. § 403.120(2), which provides, in part: "A declaration of invalidity . . . may be sought by any of the following persons and must be commenced within the times specified, but only for the causes set out in paragraph [(1)] (a) may a declaration of invalidity be sought after the death of *either party to the marriage.*" *Id.* (emphasis added). The marriage Northern sought to and ultimately did invalidate was *his* marriage to Mary, not Curtis's marriage to Mary. There is no proof about timing of Northern's knowledge relative to the common law marriage. Further, to the extent that Sandra argues that *Mary* failed to comply with the statutory requirements, the Court notes that Northern (not Mary) initiated the petition to have the marriage declared invalid. The statute of limitations issue is irrelevant.

The Court also rejects judicial estoppel. Judicial estoppel "'forbids a party from taking a position inconsistent with one successfully and unequivocally asserted by the same party in a prior proceeding.'" *Griffin v. Wal-Mart Stores, Inc.*, 135 F.3d 376 (6th Cir. 1998) (quoting *Teledyne Indus., Inc. v. Nat'l Labor Relations Bd.*, 911 F.2d 1214, 1217 (6th Cir. 1990)). Judicial estoppel applies to prevent "cynical gamesmanship," when a party "(1) took a contrary position; (2) under oath in a prior proceedings; and (3) the prior position was accepted by the court." *Id.* Sandra asserts estoppel but her argument in this regard is unclear. She alleges nothing in support of the specific elements of judicial estoppel, including any indication that a court previously accepted a contrary position taken by Mary. Mary did not participate in the invalidity proceedings, did not argue for marital validity there, and while she may have believed that she had a valid ceremonial marriage to Northern, that position would not justify estopping her from the instant claim. Things changed relative to her understanding and position, and Mary did not engage in behavior that would invoke estoppel. Simply put, judicial estoppel does not, on this record, apply, and any other estoppel theory is wholly undeveloped.

## III. Conclusion

For the reasons discussed above, the Court **FINDS** in favor of Claimant Mary Durham, who is the Eligible Spouse. The Court will enter a separate Judgment consistent with the ruling herein.

This the 31st day of January, 2014.

Signed By:

*Robert E. Wier* R̶E̶W̶

United States Magistrate Judge